**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2643-23

OLGA MARTINEZ, and
NORMA PACHECO, in her
individual capacity and as
Power of Attorney for
OLGA MARTINEZ,

      Plaintiffs-Respondents,

v.

BOP FINANCIAL GROUP, LLC,
and LISA FARAH CALIXTE,

      Defendants,

and

LUIS S. JEAN-BART, and
MARIA MORALES,

      Defendants-Respondents,

and

PFS INVESTMENTS, INC.,
d/b/a PRIMERICA,

      Defendant-Appellant.

_____

Argued November 12, 2024 – Decided March 31, 2025

Before Judges Sabatino, Gummer and Jacobs.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-3054-23.

Terry Weiss (Duane Morris LLP) of the Georgia bar, admitted pro hac vice, argued the cause for appellant (Duane Morris LLP, attorneys; Terry Weiss, Brian N. Biglin and Matthew M. Caminiti, of counsel and on the briefs).

Kyle E. Vellutato argued the cause for respondents Olga Martinez and Norma Pacheco (O'Toole Scrivo, LLC, attorneys; Kyle E. Vellutato and Nicholas P. Whittaker, of counsel and on the brief; Antonio A. Vayas, on the brief).

McCarthy & Soriero, LLC, attorneys for respondent Luis S. Jean-Bart, join in the brief of appellant PFS Investments, Inc.

Milton Bouhoutsos Jr., Esq., LLC, attorney for respondent Maria Morales, joins in the brief of appellant PFS Investments, Inc.

PER CURIAM

Defendant PFS Investments, Inc., d/b/a Primerica ("Primerica"), along with defendants Luis S. Jean-Bart and Maria Morales, appeals from an April 12, 2024 order issued by the Law Division denying its motion to compel arbitration. We affirm, substantially for the reasons articulated in Judge Joseph A. Turula's well-reasoned oral analysis and ruling.

2

A-2643-23

I.

In August 2023, plaintiffs Olga Martinez and her goddaughter, Norma Pacheco, acting in the capacity of power of attorney for Martinez, filed a complaint in the Law Division against Primerica, Luis Jean-Bart, BOP Financial Group, LLC ("BOP"), Lisa Farah Calixte, Maria Morales, and fictitious individuals and corporate entities. The complaint consisted of ten counts, including counts based on alleged breach of contract, breach of fiduciary duty, fraudulent inducement, and violations of the Consumer Fraud Act, N.J.S.A. 56:8- to -229, and New Jersey Anti-Racketeering Act (RICO), N.J.S.A. 2C:41-1 to -6.2. Specifically, plaintiffs alleged they were victims of theft in a sum over $1.4 million, representing much of Martinez's life savings. Their claims stemmed from the conduct of a Primerica employee, Luis Jean-Bart, who purportedly induced plaintiffs to rollover the majority of their investment with Primerica into another entity, co-defendant BOP. Jean-Bart had introduced plaintiffs to Calixte, who allegedly made false representations to plaintiffs, inducing them to invest over $2.1 million with BOP. Morales, one of Jean-Bart's assistants and a Primerica employee, accompanied Pacheco on three occasions to ensure the wiring of the monies to BOP. The investments made with BOP, purportedly against plaintiffs' instructions, resulted in substantial

3

losses. According to plaintiffs, Jean-Bart and Morales continuously represented to them that their investments with BOP had made significant gains, but documentation obtained through plaintiffs' investigation revealed substantial losses and purported fraud by Primerica's former employees.

Defendants moved to dismiss the complaint, compel arbitration, and stay the proceedings against them pending arbitration. The motion to compel arbitration was based on provisions allegedly acknowledged and accepted by plaintiffs through electronic signature as part of the application process with Primerica. Defendants further contended that plaintiffs confirmed their agreement to an arbitration provision every time they accessed their accounts online through Primerica's proprietary system, referred to as the Shareholder Account Manager website ("SAM"). Plaintiffs challenged defendant's contentions, certifying they had not signed or agreed to an arbitration provision when completing the account applications or accessing their accounts. Plaintiffs further asserted that Jean-Bart completed the applications on their behalf and, as such, they did not knowingly waive their right to pursue relief in the Superior Court.

A-2643-23

Background

At the time of the motion hearing, defendant Martinez was ninety-four years old. She could not speak or read English and had no training in finance. Defendant Pacheco, Martinez's goddaughter and caretaker, was conveyed Martinez's power of attorney, authorizing her to make financial decisions for Martinez. Pacheco too had a limited ability to read or write English. Pacheco helped Martinez find a financial advisor to invest the nearly $2 million savings Martinez had accumulated over her lifetime.

In April 2018, community contacts recommended Jean-Bart to Pacheco, who then met with Jean-Bart jointly with Martinez. Plaintiffs agreed to open six separate Primerica accounts with Jean-Bart: (1) three accounts with Martinez and Pacheco as joint tenants with rights of survivorship; (2) one account with Martinez, Pacheco, and a third party as joint tenants; and (3) two 529-college-savings-plan accounts in the name of Martinez only.

According to Pacheco's certification, Jean-Bart did not provide plaintiffs with an account application on paper or any information referencing an arbitration provision, nor did they discuss an arbitration provision. Pacheco certified that at no point did she read or execute an agreement that included an arbitration provision either on paper or electronically at the time the accounts

5

were opened. Jean-Bart assured plaintiffs he would attend to any necessary paperwork to set up their brokerage account. Pacheco certified, "I can state with certainty that Olga and I never read the Primerica application until after this case began . . . ." She continued, "Olga and I never signed the Primerica application and never explicitly agreed to the arbitration provision . . . . " Neither Primerica nor Jean-Bart submitted a certification or provided testimony to the trial court to contradict Pacheco's certification.

Pacheco claimed that in May 2022, Jean-Bart contacted her regarding a potential investment opportunity with BOP, inducing her to withdraw funds from Martinez's Primerica accounts and transfer those funds to various other bank accounts, ultimately controlled by BOP. Morales, who represented herself as a Primerica employee, and Calixte facilitated the transfers. In their complaint, plaintiffs alleged that Morales and Jean-Bart accompanied Pacheco three times to wire $2.1 million to BOP, perpetrating a fraud to steal over $1.4 million from plaintiffs.

In its motion to dismiss, Primerica presented a different version of the facts, largely relying on the certification of its Chief Operating Officer (COO), which was submitted for the first time in its reply brief, effectively blocking plaintiffs from countering Primerica's claims. Primerica asserted that the

6

brokerage agreements were signed electronically, not via paper and ink, and that while invested in Primerica, plaintiffs realized gains of more than $330,000.

As set forth in certification of its COO, William Nemetz, Primerica maintains that in May 2022, the same period that Pacheco was allegedly induced to rollover funds from Primerica to BOP, Pacheco registered for online access to her Primerica account information through SAM. Defendants contend that Pacheco elected to continue receiving paper statements while having online access.

According to Nemetz, online registration is required of a first-time user in SAM. The user experience includes the following steps: (1) the user clicks "First-Time User?" on the sign-in page; (2) a new "Account Registration page" opens and a user can click on "Begin New Registration." At the bottom of the Account Registration page, without the need to scroll, is a blue hyperlink: "Terms and Conditions of Use" ("T&C"); (3) should a user click on the T&C hyperlink, a new webpage opens displaying a PDF of the SAM terms of use; (4) the user must scroll to page five of the terms of use to view the pre-dispute arbitration agreement. Clicking on the T&C hyperlink is <u>not</u> required to proceed with registration, and there is not a checkbox the user must select to indicate acceptance of the T&C; and (5) if the user clicks "Begin New Registration," then

7

the user may select their login and password credentials. In summary, Primerica asserts that by clicking "Begin New Registration," the user is affirmatively agreeing to the SAM "Terms of Use" inclusive of the arbitration provision.

The Motion to Dismiss / Compel Arbitration

Defendant's application was scheduled for oral argument in February 2024. At that proceeding, plaintiffs observed that Primerica had not substantiated in its initial moving papers the contention that acceptance of the arbitration clause was integral to the application and account access process. Rather, it was only in reply that Primerica attempted to verify its claims, annexing a certification from Nemetz, together with screenshots of the SAM website. To remedy the incomplete procedural posture of this key question, the motion court offered to hear plaintiffs on an application to submit a surreply, conveying its inclination to grant same. Plaintiffs did not file a surreply or submit papers rebutting the Nemetz certification.

On April 12, 2024, the court issued an oral decision denying defendant's motion to compel arbitration, memorializing its ruling in an accompanying order. Pivotal to the motion court's ruling was its finding that Nemetz did not have personal knowledge of the accuracy of the records in question; only Jean-Bart did. Without a certification from Jean-Bart, the court ruled plaintiffs'

A-2643-23

factual claims were uncontested and, therefore, "it [wa]s unclear whether plaintiffs knowingly assented to arbitration and waived their rights to a judicial forum." The court also found defendants failed to establish that plaintiffs had assented to the arbitration provision contained in the SAM website. In so ruling, the court found the facts here mirrored those in Wollen v. Gulf Stream Restoration & Cleaning, LLC, 468 N.J. Super. 483, 501-02 (App. Div. 2021), where the subject website's terms and conditions were not reasonably conspicuous to the user.

Primerica filed a timely appeal in which Jean-Bart and Morales joined. Calixte did not participate in the trial or appellate level proceedings. Defendant BOP did not file papers on appeal.

## II.

"Final judgments of a court, for appeal purposes, are judgments that finally resolve all issues as to all parties[.]" R. 2:2-3(b). An order compelling or denying arbitration, while not a final order, is nonetheless appealable as of right. Ibid.

"We review a trial court's order granting or denying a motion to compel arbitration de novo because the validity of an arbitration agreement presents a question of law." Santana v. SmileDirectClub, LLC, 475 N.J. Super. 279, 285

9

(App. Div. 2023) (citing Skuse v. Pfizer, Inc., 244 N.J. 30, 46 (2020)). Accordingly, we "need not give deference to the [legal] analysis by the trial court." Goffe v. Foulke Mgmt. Corp., 238 N.J. 191, 207 (2019).

There exists a "liberal federal policy favoring arbitration . . ." which flows from section 2 of the Federal Arbitration Act ("FAA"). 9 U.S.C. § 2; CompuCredit Corp. v. Greenwood, 565 U.S. 95, 98 (2012). The Act mandates the enforceability of an arbitration provision included in a contract. 9 U.S.C. § 2. New Jersey law carries a similar mandate applicable to all "agreements." N.J.S.A. 2A:23B-6; see also Achey v. Cellco P'ship, 475 N.J. Super. 446, 454 (App. Div. 2003) (it is well-established that New Jersey courts favor arbitration), certif. granted, 255 N.J. 286 (2023). In 2003, the New Jersey Legislature enacted a modified version of the Uniform Arbitration Act, N.J.S.A. 2A:23B-1 to -32. "New Jersey case law acknowledges the preeminence of the national policy established by Congress through the FAA as well as the Supreme Court's holding interpreting and implementing that policy." Goffe, 238 N.J. at 207.

Arbitration is a matter of contract. Atalese v. U.S. Legal Serv. Grp., 219 N.J. 430, 441 (2014). The FAA "permits states to regulate . . . arbitration agreements under general contract principles[.]" Martindale v. Sandvik, Inc., 173 N.J. 76, 85 (2002). New Jersey "may regulate agreements, including those

that relate to arbitration, by applying its contract-law principles that are relevant in a given case." Leodori v. CIGNA Corp., 175 N.J. 293, 302 (2003).

The Court in Atalese held that an enforceable agreement to arbitrate, like any other contract, "must be the product of mutual assent." 219 N.J. at 442 (quoting NAACP of Camden Cnty. E. v. Foulke Mgmt., 421 N.J. Super. 404, 424 (App. Div. 2011)). The Court emphasized that a legally enforceable agreement requires "a meeting of the minds." Ibid. However, if there is a factual dispute with respect to whether a plaintiff has ever seen an arbitration provision, then a court should review the question of assent to the arbitration agreement. Knight v. Vivint Solar Developer, LLC, 465 N.J. Super. 416, 424 (App. Div. 2020).

For an arbitration provision to be effective, the party waiving the right must "have full knowledge of his legal rights and intent to surrender those rights." Knorr v. Smeal, 178 N.J. 169, 177 (2003). "Our jurisprudence has stressed that when a contract contains a waiver of rights – whether in an arbitration or other clause – the waiver 'must be clearly and unmistakably established.'" Atalese, 219 N.J. at 444 (quoting Garfinkel v. Morristown Obstetrics & Gynecology Assocs., P.A., 168 N.J. 124, 132 (2001)).

A-2643-23

<u>Account Registration - Personal and Direct Knowledge</u>

Here, in opposition to the motion to dismiss, Pacheco submitted a certification stating that she, in both her individual capacity and as designated power of attorney for Martinez, "never physically signed any documents and never knew or understood that [they] would not be able to access the [c]ourt if [they] ever had a dispute . . . ." Pacheco certified:

> I do not recall ever seeing the "Account Application" that was submitted with [d]efendant's motion during the meeting with [Jean-Bart] . . . . I can state with certainty that Olga and I never read the Primerica application until after this case began and [defendants] filed their motion to compel me to go to arbitration.

Under those facts, plaintiffs could not have knowingly and voluntarily waived their rights to seek relief in the courts. Primerica did not refute plaintiffs' contention. Pacheco also certified that no one from Primerica, including Jean-Bart, had ever reviewed or explained the arbitration provision to her or Martinez. The motion court found the Nemetz certification that plaintiffs' applications were digitally signed by them and their Primerica representative, Jean-Bart, to be insufficient, as the certification was not based on personal knowledge of the facts. As such, plaintiffs' sworn statements were uncontested, and the motion court properly determined there was "insufficient evidence for [the court] to conclude that the plaintiffs assented to arbitration with respect to the account

12

application."

<u>The SAM Account Registration Website and "Browsewrap" Principles of Acceptance</u>

When an individual's purported assent to an arbitration agreement is electronic, such as through a website, the validity of the assent may depend on the extent of the other party's efforts to ensure that the provision is clearly visible. <u>Wollen</u>, 468 N.J. Super. at 502-03. "An arbitration provision is not enforceable unless the consumer has reasonable notice of its existence." <u>Id.</u> at 498 (citing <u>Hoffman v. Supplements Togo Mgmt., LLC</u>, 419 N.J. Super. 596, 609 (App. Div. 2011)).

New Jersey courts have recognized the validity of web-based contracts "for decades." <u>Wollen</u>, 468 N.J. Super. at 495. "The enforceability of an internet consumer contract often turns on whether the agreement is characterized as a 'scrollwrap,' 'sign-in wrap,' 'clickwrap,' or 'browsewrap' – or a hybrid . . . . " <u>Ibid.</u>

A "scrollwrap agreement" is described as requiring the user to scroll through the agreement and physically click on an "I agree" button to demonstrate their assent to the terms and conditions presented. <u>Id.</u> at 496 (citing <u>Berkson v. Gogo LLC</u>, 97 F. Supp. 3d 359, 395 (E.D.N.Y. 2015)). A "sign-in wrap agreement" "couples assent to the terms of a website with signing up for use of

the site's services . . . ." Ibid. "Clickwrap agreements," which have been "routinely enforced by the courts[,]" require the user to click on a dialog box on the screen in order to proceed to the next step. Skuse, 244 N.J. at 55 n.2. Browsewrap "exists where the online host dictates that assent is given merely by using the site." Wollen, 468 N.J. Super. at 496 (quoting Berkson, 97 F. Supp. 3d at 394). In contrast to clickwrap agreements, "browsewrap agreements do not require users to expressly manifest assent." Ibid. As such, the decision to enforce a browsewrap agreement may "turn[] on whether the terms or a hyperlink to the terms are reasonably conspicuous on the webpage." Ibid. In any case, the relevant inquiry is whether the design and presentation of the website provided reasonable notice of the terms to the user. See Hoffman, 419 N.J. Super. at 611.

In Wollen, we found there was no voluntary and knowing assent to an arbitration provision within a contractor referral service's website terms and conditions. 468 N.J. Super. at 503. The user in that case was required to navigate through several web pages before reaching the seventh and final page containing blank fields for the user to input their personal contact information. Id. at 487. On the final page was a single line of text stating, "By submitting this request, you are agreeing to our Terms & Conditions." Id. at 488. The

Terms and Conditions referenced a separate seven-page document containing the arbitration provision. Id. at 489. A user was able to register and "click through" to the submission end-page without ever actually viewing the terms and conditions. Id. at 502-03. In finding that the browsewrap method, without more, is disapproved, the court stated:

> At the very least, [] the internet user should be directed in words — and not just by a font of a different hue — to click on that hyperlink. In the alternative, the hyperlinked document [] should contain some semblance of an acknowledgement, or inability to submit a request unless the user scrolls through the terms and conditions at issue.
>
> [Id. at 503.]

In contrast, the Santana court found an arbitration provision enforceable in the click-wrap context. 475 N.J. Super. 279, 291. There, the website required the user to click an "I Agree" box referencing an "Informed Consent" page, which contained the provision in bold and capital letters; registration could proceed only after a user viewed and assented to the agreement. Id. at 290-91; see also Skuse, 244 N.J. at 30 n.2 (upholding an arbitration agreement in the click-wrap context when the agreement was communicated via email and the user was required to acknowledge receipt).

Here, the SAM registration process is best classified as a browsewrap

agreement, based on the descriptors provided in the Nemetz certification. The SAM user experience allows a new user to register for online account access without having to open the "Terms and Conditions of Use," which are embedded in a hyperlink. The user can complete registration without opening, acknowledging, or assenting to the T&C, which contain the mandatory arbitration provision. Primerica argues that a user is placed on inquiry notice of the T&C by way of a hyperlink. Primerica further asserts that completing the registration process constitutes acceptance of the T&C.

However, even assuming that Primera could effectively establish that SAM registrants are placed on inquiry notice of the website's T&C, there exists no mechanism (e.g., check box or other acknowledgement feature) to demonstrate that the user assents to terms of the arbitration agreement. Rather, the user experience and presentation of the SAM page fits squarely within the browsewrap construct analyzed in Wollen, wherein a passive hyperlink to terms and conditions need not be clicked on by the user to proceed with registration. 468 N.J. Super. at 502-03. As we found in Wollen, this format does not demonstrate knowing or voluntary assent. Id. at 503. The factual dispute over whether it was Pacheco herself who registered for SAM and had notice of the T&C, or if it was an unauthorized third-party who had registered for SAM, is

16

inconsequential. That is to say, even if the court could find that notice of the T&C had been adequately provided to a user, defendants would fail to establish a knowing or voluntary waiver of rights; the SAM user experience mirrors that in Wollen.

### Plaintiffs' Course of Conduct and the Brokerage Relationship

Finally, we consider whether plaintiffs' course of conduct constituted an acceptance of benefits of the brokerage relationship with Primerica, such that plaintiffs were bound by the arbitration clause. "The manifestation of assent [to a contract] may be made . . . by written or spoken words or by other acts . . . . " Restatement (Second) of Contracts § 19 (Am. L. Inst. 1981). However, "the conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct . . ." Ibid. New Jersey contract law recognizes that conduct can constitute contractual assent in certain circumstances. Martindale, 173 N.J. at 88-89. These "certain circumstances" have commonly included employment contracts in which continued willful employment has "been found to constitute sufficient consideration to support certain employment-related agreements." Id. at 88. Such circumstances are not applicable here.

Here, defendant argues that plaintiffs' course of conduct and acceptance of benefits of the brokerage relationship with Primerica over a period of five years should constitute assent to be bound by the client agreement purportedly included in the account applications. Assuming arguendo that plaintiffs did not sign the account applications that would bind them to the client agreement, plaintiffs do not contest they invested over $1.4 million with Primerica for which they received investment guidance and account statements. Defendant asserts the actions of both parties would logically be understood to be governed by a written agreement, and the standard language of that agreement. Accordingly, defendant argues plaintiffs should be estopped from litigating their claims in state court.

Defendant relies on the non-precedential case[1] Schwartz v. Comcast Corp., 256 F. App'x 515 (3d Cir. 2007) for the proposition that a defendant's standard practice of providing a subscription agreement to every new customer was sufficient to find that a plaintiff had notice of such agreement, together with

---

[1] Under Rule 1:36-3, no unpublished opinion "shall constitute precedent or be binding upon any court." Although parties may bring unpublished opinions to the attention of the court for purposes of their argument, unpublished opinions do not have precedential authority. Pressler & Verniero, Current N.J. Court Rules, cmt. 2 on R. 1:36-3 (2025).

its content – in this case, the arbitration provision. While this is the nominal holding of <u>Schwartz</u>, key to the holding was that the party opposing arbitration received and had an opportunity to review the alleged arbitration agreement, even though the party failed to do so. That fact distinguishes <u>Schwartz</u> from the facts here, in that there is no evidence in the record from a person with personal knowledge of how plaintiffs' accounts were opened that plaintiffs ever received Primerica's arbitration agreement. Moreover, the plaintiff in <u>Schwartz</u> affirmatively agreed to various work orders, each of which stated he was bound by the subscriber agreement. <u>Id.</u> at 519. The Third Circuit also explained in dicta that "in some cases, a party is excused from the terms of a contract where he never had access to the contract and thus could not make himself aware of its terms." <u>Id.</u> at 520. The record in this matter is devoid of any evidence that plaintiffs ever received notice of an arbitration agreement until <u>after</u> they commenced their underlying complaint.

Finally, defendant cites <u>E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.</u>, 269 F.3d 187 (3d Cir. 2001), for the proposition that non-signatories to a contract should be bound to agreements on the theory that non-signatories should not be permitted to accept benefits of an agreement and induce reliance by the other party without being estopped from

denying arbitration. However, defendant's argument falls short because the plaintiffs here would certainly be considered signatories to an arbitration agreement. The motion court considered and correctly concluded that E.I. DuPont has no bearing on this matter.

To the extent we have not otherwise commented on them, we have considered defendants' other arguments and conclude they lack sufficient merit to warrant discussion in a written decision. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-2643-23